## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

ROSS BARRANCO & KATIE SHIER

       Plaintiffs

  vs.

UNIVERSITY OF MICHIGAN BOARD
OF REGENTS,

      A State Funded University

      Defendant.

**Case No.**
**HON.**


**COMPLAINT FOR DAMAGES,**
**DECLARATORY, AND**
**EQUITABLE RELIEF**

Dave Peters (P48648)
Attorney for Plaintiffs
Pacific Justice Institute
PO Box 51787
Livonia, Michigan 48151-1787
Email:  dpeters@pji.org
Phone: (734) 732-4050/ (916) 857-6900

## COMPLAINT FOR DAMAGES, DECLARATORY, AND EQUITABLE RELIEF

Plaintiffs ROSS BARRANCO and KATIE SHIER complain against Defendant for equitable and declaratory relief and damages and state as follows:

## JURISDICTION AND VENUE

1.    This action arises under the laws of the United States, specifically, Title II, and the First (Free Exercise Clause) and Fourteenth (Due Process and Equal Protection Clause) Amendments to the United States Constitution.

2.    Plaintiff brought these claims against a Michigan government entity for declaratory relief and damages in the Court of Claims pursuant to MCL 600.6419, which provides exclusive jurisdiction for declaratory relief actions against Michigan government entities to the Court of Claims.

3.    The Michigan Court of Claims 1) dismissed the federal claims for lack of subject matter jurisdiction; 2) dismissed the Michigan civil rights claims under Elliot Larsen; and 3) retained jurisdiction over the Michigan constitutional claims. Plaintiff now brings the federal claims for injunctive relief to federal court pursuant to Title II, and the U.S. Constitution. **See Exhibit 1.**

4.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1343.

2

5.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

6.      This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§2201-02, implemented through Rule 57 of the Federal Rules of Civil Procedure.

7.      This Court is authorized to grant Plaintiffs' prayer for relief regarding damages pursuant to Rule 54 of the Federal Rules of Civil Procedure.

## **PARTIES**

8.      Plaintiff ROSS BARRANCO is a resident of the State of Michigan and a kidney transplant candidate. He is a patient who was placed on the Kidney Transplant List who was removed from this list by the Defendant.

9.      Plaintiff KATIE SHIER is a resident of the State of Michigan and a heart transplant candidate with just 7% heart function who is being kept alive via an implanted Ventricular Assist device. She is a patient placed on the Heart Transplant List who was removed from this list by the Defendant.

10.     Defendant UNIVERSITY OF MICHIGAN BOARD OF REGENTS is the governing body for the University of Michigan, a State funded public university.

11.     Defendant UNIVERSITY OF MICHIGAN BOARD OF REGENTS is the controlling authority for the University of Michigan Transplant Center.

12.     Defendant is an academic and health care provider inclusive of University of Michigan Medical School, Mott Children's Hospital, University Hospital, and Women's Hospital.

13.     The UNIVERSITY OF MICHIGAN TRANSPLANT CENTER (UMTC) and UNIVERSITY OF MICHIGAN HEALTH SYSTEMS (UMHS) are divisions of the University of Michigan.

14.     All entities are and were, the responsibility of the Defendant UNIVERSITY OF MICHIGAN BOARD OF REGENTS.

## **FACTS**

15.     Plaintiffs each took extraordinary measures in order to prepare for transplantation and after months of waiting, they finally were able to get on the transplant list to potentially obtain a life-saving organ.

16.     Plaintiff ROSS BARRANCO lost significant weight, took various medications to prepare him for transplantation, and made it onto the waiting list for a kidney.

17.     Plaintiff ROSS BARRANCO became eligible for a donated kidney in 2021 but due primarily to losing weight and carefully following the instructions of

4

the medical team, his kidney function improved and Plaintiff generously asked to be placed on the wait list rather than the active list so that another unknown person might get the available kidney who needed it immediately.

18.     Plaintiff KATIE SHIER was notified by letter from the University of Michigan Health Systems dated June 29, 2021, that she had been granted placement on the Transplant Waiting List.

19.     In the interim period while the Plaintiffs were waiting for the availability of a suitable organ, they were removed or threatened to be removed from the list when the Defendant, UNIVERSITY OF MICHIGAN BOARD OF REGENTS imposed a new requirement in December 2021.

20.     The new requirement was that all transplant patients at UNIVERSITY OF MICHIGAN receive the COVID-19 vaccination before proceeding with their needed procedure.

21.     As explained further below, Plaintiffs have significant and sincere religious and medical objections to taking the vaccine.

22.     Plaintiffs made known their sincere religious objections to the Defendant in writing.

23.     On November 5, 2021, the federal government issued an Administrative Order through the Occupational Health and Safety Administration (OSHA).

24.     The OSHA emergency temporary standard (the Vaccination and Testing ETS), under sections 4, 6(c), and 8 of the Occupational Safety and Health Act of 1970 (29 USC 653, 655(c), 657), purported to protect unvaccinated employees of large employers (100 or more employees) from the risk of contracting COVID–19 by strongly encouraging vaccination (86 FR 61402).[1]

25.     On January 13, 2022, the Supreme Court of the United States blocked enforcement of the federal vaccine mandate for private covered employers (with 100 or more employers).[2]

26.     Also on January 13, 2022, the Supreme Court of the United States narrowly permitted enforcement of the federal vaccine mandate for health care workers.[3]

27.     The effect of the CMS order was to bar private hospitals from exercising independent medical judgement with respect to the COVID-19 Emergency Use Authorizations and to confer the authority and responsibility for

---

[1] A full text of this Order can be found at:  https://public-inspection.federalregister.gov/2022-01532.pdf

[2] The Supreme Court's decision in National Federation of Independent Businesses vs. OSHA can be found at: https://www.supremecourt.gov/opinions/21pdf/21a244_hgci.pdf

[3] The Supreme Court's decision in Biden vs. Missouri can be found at: https://supreme.justia.com/cases/federal/us/595/21a240/

exercising independent medical judgement on the State, specifically the federal government and their various overlapping agencies.

28. Responsibility for implementing this governmental policy in derogation of the Plaintiffs' religious rights falls exclusively within the purview and responsibility of the Defendant, UNIVERSITY OF MICHIGAN BOARD OF REGENTS.

29. Before, during, and after the administrative order(s), the federal government engaged in a pattern and practice of strong arming, threatening, coercing, and forcing physicians and medical providers to comply with their arbitrary diktats for political reasons and not for medical or public health reasons.[4]

30. Before, during, and after the administrative order(s), the federal government engaged in a pattern and practice of strong arming, threatening, coercing, and forcing medical decision makers, physicians, and medical providers to comply with their arbitrary diktats which are far reaching in restricting economic activity and civil liberties but are largely unsupported by scientific research.

31. Among other activities, federal officials engaged with friendly State governments to threaten the State issued medical licenses of physicians and other medical providers for failure to comply with federal diktats, caused to be fired

---

[4] c.f. Blaylock, Russel, "COVID:  What Is Truth?", Surg Neurol Int. 2022; 13: 167. Published online 2022 Apr 22. at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9062939/

many thousands of health care workers for refusing to comply with federal diktats, silenced all medical professionals from speaking in public or in private about their own independent judgement regarding the pandemic and the measures to combat the pandemic by threatening their medical licenses, corresponded with physicians and medical providers threatening and demanding implementation of measures not within the medical judgment of the physicians, and without the acquiescence of their patients.[5]

32. While this pressure on physicians and other decision makers like the Defendant UNIVERSITY OF MICHIGAN BOARD OF REGENTS is unprecedented, unlawful, and violates thousands of years of medical and public health practice, in acquiescing to this pressure, and in acceding to the pressure and requiring the Plaintiffs and transplant physicians to comply with their policies, the Defendants have violated the due process and religious rights of the Plaintiffs, including the right to exercise their religion, the right to practice their religion, the right to privacy, the right to bodily integrity, the right to life, the right to decide what medical treatment they will receive, and the right to not be denied medical treatment on account of their religious practices.

33. Notwithstanding the unlawful governmental pressure exerted on physicians and medical providers, the Defendants and their employed and contracted

---

[5] Id.

physicians and medical providers have violated their duty of care to the patients by imposing arbitrary and capricious dictates and effectively giving patients a choice to die or to violate their religious faith.

34. In response to this incredible and unprecedented pressure campaign exerted against medical providers, in a letter dated December 7, 2021, transplant patients on the waiting list at UMHS were advised that in order "to be active on the waitlist at our Center, and to undergo transplant surgery" the patient would have to complete the COVID-19 vaccination series.

35. In a letter dated February 1, 2022, UNIVERSITY OF MICHIGAN advised Plaintiffs that "a recent change in transplant center procedures" required all listed transplant patients to complete the vaccination series for COVID-19.

36. Both letters further informed Plaintiffs, who are and were eligible transplant recipients waiting for a life-saving procedure, that "you have 3 months to complete the COVID vaccination series or you will be removed from the transplant list."

37. Upon information and belief, this policy has not been updated since implementation on or about December 7, 2021, in response to OSHA, CDC, and other federal mandates and individual pressure and correspondences, including phone calls, emails, and letters to the various physicians, and the pressure campaign from the government and their agencies.

38. The lack of update in the UMHS Transplant Center policy demonstrates that such policy is a consequence of the aforementioned federal pressure campaign insofar as there have been a number of changes made by the CDC and federal health decision makers including increasing the requirement to be "fully vaccinated" from a one-shot series (Johnson and Johnson) or two shot series (Moderna and Pfizer), and then to a requirement for a 3rd shot booster, and now a requirement for a 4th shot booster which is not reflected in the policy statement by UNIVERSITY OF MICHIGAN.

39. The current policy on the UNIVERSITY OF MICHIGAN transplant board[6] is unclear on whether patients are required to get 1 shot, 2 shots, or 4 shots.

40. Due to the lack of specificity, there is no clear direction on even the number of shots being demanded which suggests an arbitrary and capricious purpose that is not medically indicated.

41. This lack of specificity, with no clear direction on even the number of shots being demanded, show the requirements are based on federal health care decision makers public health and political preferences rather than a medical purpose legitimately determined by the Plaintiffs' physicians to be beneficial to the Plaintiffs.

---

[6] The policy can be found on the Transplant Board website and was downloaded on 4-6-2022 at: https://med.umich.edu/pdf/transplant-ctr/Pt-ed-doc-COVID-vaccine-requirement.pdf

42. Medical decisions made without medical authority are by definition arbitrary and capricious.

43. Upon information and belief, Plaintiffs allege that the UNIVERSITY OF MICHIGAN BOARD OF REGENTS' policy was implemented under pressure from the federal government and is not based on transplant research, or any peer reviewed studies on the efficacy of the experimental COVID vaccine within the context of transplantation surgery.

44. Defendant has and had duties owed to the patients, including Plaintiffs, and to the medical provider employee/contractors, not to federal regulators.

45. Defendant, acting under color of law, imposed this mandate on the Plaintiffs without scientific or medical proof of its safety and efficacy in transplant patients.

46. Defendant imposed the federal government's COVID vaccine mandate on the Plaintiffs without scientific or medical proof on its transplant patients, including Plaintiffs, without using sound medical judgment, and on information and belief, without the support of the Transplant Board, without support of the transplant physicians, and with no supporting scientific or medical research whatsoever on the potential long-term health effects of the COVID vaccine.

47. Defendant imposed the government's COVID vaccine mandate on the Plaintiffs without consideration of the individual medical needs of the Plaintiffs.

48.  Defendant imposed the government's COVID vaccine mandate on the Plaintiffs without any supporting medical or scientific research on even the short-term safety and efficacy of the vaccine in such patients, and with no research whatsoever on the long-term safety and efficacy of the vaccine in such patients.

49. Defendant has violated its duty of care to the Plaintiffs by failing to require scientific evidence of the benefit of the COVID-19 vaccines before imposing a mandate requiring them.

50. Plaintiffs have sincerely held religious beliefs in opposition to the COVID-19 experimental vaccination.

51. Plaintiffs objected in a timely manner to the sudden change in requirements, expressing sincerely held religious beliefs and requesting a religious exemption to the requirement.

52. Plaintiffs are practicing Christians and members of the Catholic Church with strongly held beliefs against using products developed through the use of aborted fetal tissue.

53. All three of the currently available COVID-19 vaccines are produced by, derived from, manufactured with, tested on, developed with, or otherwise connected to aborted fetal cell lines.

54. The North Dakota Department of Health, in its literature for those considering one of the three, currently available COVID-19 vaccines, notes the

following: "[t]he non-replicating viral vector vaccine produced by Johnson &

Johnson did require the use of fetal cell cultures, specifically PER.C6, in order to

produce and manufacture the vaccine."[7]

55. The Louisiana Department of Health likewise confirms that the Johnson &

Johnson COVID-19 vaccine, which used PER.C6 fetal cell line, "is a retinal cell

line that was isolated from a terminated fetus in 1985."[8] [9]

56. Defendant did not provide any type of interactive process to determine if the

Plaintiffs could be reasonably accommodated.

57. Defendant has not provided any medical justification for its decision to

remove Plaintiffs from the transplant list and the only available research Plaintiffs

---

[7] Se North Dakota Health, COVID-19 Vaccines & Fetal Cell Lines (December 1, 2021), available at COVID-19_Vaccine_Fetal_Cell_Handout.pdf (last visited June 16, 2022.

[8] See, Louisiana Department of Health, You Have Questions, We Have Answers: COVID-19 Vaccine FAQ (Dec. 21, 2020), available at Microsoft Word - You Have Questions COVID-19 Vaccine FAQ (la.gov)

[9] The Louisiana Department of Health's publications confirm that aborted fetal cells lines were used in the "proof of concept" phase of the development of their COVID-19 mRNA vaccines. The North Dakota Department of Health, in its handout literature on COVID-19 vaccines, notes: "[e]arly in the development of mRNA vaccine technology, fetal cells were used for 'proof of concept' (to demonstrate how a cell could take up mRNA and produce the SARS- CoV-2 spike protein) or to characterize the SARS-CoV-2 spike protein."

could find on transplants and the COVID-19 vaccine shows that the vaccine is LESS effective for Transplant patients.[10]

58. There are no safety or efficacy studies of the COVID-19 vaccine and transplant patients.

59. There are no long-term safety or efficacy studies on the COVID-19 vaccine whatsoever, whether in the context of transplantation or for general medical use.

60. The available research suggests quite strongly that the COVID-19 vaccine is LESS effective in transplant cases due to the lower production of SARS COV-2 Spike Protein antibodies following the immunosuppression therapy needed for receiving an organ.[11] [13]

61. The COVID-19 vaccine provides considerably less benefit to the predominate Omicron variant currently circulating.[12]

62. In early 2022, the Biden administration discontinued the use of monoclonal antibodies due to the fact that these engineered antibodies were ineffective against

---

[10] Organ Transplant Recipients Remain Vulnerable to COVID-19 Even After Second Vaccine Dose  (hopkinsmedicine.org)

[11] Id.

[12] https://www.washingtonpost.com/health/interactive/2022/vaccine-omicron-effectiveness/

the current COVID variant circulating with the FDA saying; "The data shows the vaccines are highly unlikely to be effective against…Omicron.").[13]

63. The COVID-19 vaccines introduce the Spike Protein pathogen into the body resulting in the production of THE SAME TYPE of synthetic Spike Protein antibodies that the administration has discontinued because it has determined they are ineffective against the COVID Omicron variant that remains predominant today.

64. Mandating COVID-19 Vaccinations is not the standard of care for transplant patients.

65. The UNOS Transplant Living website advises patients that hospitals determine whether organ transplant recipients must receive one of the COVID vaccines, as set forth below:[14]

> *Is a COVID-19 vaccination required in order to receive an organ transplant? Each transplant hospital makes its own decisions about listing candidates according to the hospital best clinical judgments, including whether or not any specific vaccination is part of their eligibility criteria. If you have any questions about listing criteria at your transplant hospital, we encourage you to contact the hospital.*

---

[13] https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-limits-use-certain-monoclonal-antibodies-treat-covid-19-due-omicron

[14] https://transplantliving.org/covid/ (last visited March 20, 2023).

66. By removing Plaintiffs from the active Transplant Waiting List, Defendant made a life-or-death decision for Plaintiffs and removed an existing right.

67. By removing Plaintiffs from the active Transplant Waiting List, Defendant made a life-or-death decision for Plaintiffs without their consent and removed an existing right without providing any type of due process.

68. Defendant is forcing Plaintiffs to choose between life-saving treatment and their constitutional rights including the right to exercise their faith, the right to life, the right to privacy, the right to seek and obtain medical treatment of their choosing, the right to deny medical treatments they do not wish to take, the right to bodily integrity, and other constitutional rights.

69. Defendant did not provide any type of process to determine if the exemption requests of Plaintiffs could be reasonably accommodated.

70. The letter from the board rejecting the Plaintiffs' request provides only anecdotal justifications for the requirement and is devoid of any research, much less any peer reviewed research on the issue of COVID-19 vaccination and transplantation.

71. The decision of the Defendant mandating COVID-19 vaccinations or suffer removal from the Transplant List, and certain death, is arbitrary, capricious and was not made as a private decision between physician and patient.

72. There is no consensus among hospitals and transplant centers that COVID-19 vaccines must be taken by transplant recipients with many transplant centers rejecting federal pressure and following current medical standards and practices.

73. An alternative that would provide the same or better "public health" benefits is to simply test for COVID before beginning a transplant procedure.[15]

74. The requirement that Plaintiffs receive a COVID vaccine violates the American Society of Transplantation's Ethics Statement.

75. Any hospital removing/deactivating recipients or donors for not taking a COVID vaccine runs afoul of the "Ethics Statement" espoused by the American Society of Transplantation (AST) which expressly acknowledges the significance of the religious beliefs of candidates/recipients, as set forth below:[16]

AUTONOMY

- All participants in solid organ transplantation (donors, recipients, providers, investigators) should be respected as autonomous individuals whose interests may not always coincide.

- Healthcare providers, recipients (or candidates) and living donors bring personal, philosophical, and religious beliefs that should be respected.

---

[15] "Transplant providers and centers serve as gatekeepers to transplant waiting lists." The Limits of Refusal: An Ethical Review of Solid Organ Transplantation and Vaccine Hesitancy, Olivia Kates et al, Am J Transplant 2021; 21:2637-2645 (12/23/20).

[16] Ethics Statement - Revised and Approved by the AST Board of Directors on December 6, 2012.

- All participants must be fully informed of the risks and benefits of all procedures.

76. In fact, "[t]he Department of Health and Human Services acknowledges that "it and the Organ Procurement and Transplant Network have not 'set any specific guidance on vaccination status for organ recipients nor living organ donors."[17]

77. Despite there being no "official policy" with regard to organ donors and donees, federal authorities and governmental entities, largely under the direction and/or control of the State, federal, and local governments have, on information and belief, instituted policies in violation of the Plaintiffs' constitutional and fundamental rights.

78. In particular the CDC, HHS, NIH and others have exerted extraordinary pressure on physicians, boards, administrators, nurses, and other providers to comply with the vaccine guidelines imposed on December 7, 2021.

79. December 7, 2021, was the date of the OSHA imposed vaccine requirements that were overruled by the Supreme Court of the United States,[18] and the same day the UMHS transplant board imposed its requirements.

---

[17] *Id.*

[18] *NFIB VS. OSHA* 595 U.S. _____ (2022) full opinion located at: https://www.supremecourt.gov/opinions/21pdf/21a244_hgci.pdf

80. The federal government has not officially imposed a COVID mandate on organ transplant recipients, but bowing to behind-the-scenes federal pressure from various government directors and their agencies, and not for a legitimate medical purpose, UMHS has unlawfully, and without providing Due Process, imposed such a requirement.

81. Because "[v]accine refusal differs by racial, ethnic, socioeconomic, or religious groups… and … is, so far, uncommon, the difference in transplant outcomes between vaccinated and non-vaccinated recipients would have to be substantial to justify excluding vaccine-refusing patients on the basis of overall utility."[19]

82. UMHS failed to provide Plaintiffs with any data showing that the anticipated outcome for unvaccinated recipients is "vastly inferior" to vaccinated ones because no such data exists.

83. Such information was not provided because the allegation that the COVID vaccine provides a substantial benefit to transplant patients is false.

84. Such information was also not provided because the allegation that the COVID vaccine provides a substantial benefit to transplant patients is probably

---

[19] The Limits of Refusal: An Ethical Review of Solid Organ Transplantation and Vaccine Hesitancy, Olivia Kates et al, Am J Transplant 2021; 21:2637, 2641.

unknowable given the small effect of the more recent variants causing the COVID-19 infection and the small sample size of the transplant eligible community.

85. Notably, chief among the reasons for not mandating COVID vaccines for organ recipients is their novelty:[20]

> For new vaccines, such as those currently in development for SARS-CoV-2, a demonstrated track record of safety and efficacy must be established before these vaccines will be included in ACIP [Advisory Committee on Immunization Practices] recommendations. In addition, as with other new agents, safety and efficacy should be demonstrated for patients with end-stage organ dysfunction or organ transplants, and any theoretical risk for immunostimulation must be considered prior to updating vaccine requirements specific to transplant candidates.

86. Given these pressing ethical and moral issues, it is not surprising that "[a]s of late April, [2021] fewer than 7 percent of transplant programs nationwide reported inactivating patients who were unvaccinated or partially vaccinated against COVID-19.[21]

---

[20] AJT is official journal of the American Society of Transplantation and the American Society of Transplant Surgeons.  See 2621.

[21] Organ centers tell transplant patients to get a COVID shot or move down on waitlist (bangordailynews.com) (last viewed on March 20, 2023). Research by Dr. Krista Lentine, nephrologist at the Saint Louis University School of Medicine.

87. COVID patients have been receiving transplants since before the vaccine was available and as of yet there is almost no data on the efficacy of the vaccine in transplant cases.

88. In the transplantation community, it is generally understood that "[t]he goal is to treat the most medically urgent cases first."[22]

89. In fact, individuals infected with the COVID virus have been receiving organ transplants since 2020, with an increasing number in 2021; some experts predict this will "be a completely new category of transplant patients."[23]

90. It is arbitrary and capricious and medically inexplicable that recent COVID survivors whose need for transplants resulted from COVID infection received donated organs, yet candidates who refuse COVID vaccines, but have no active COVID infections, cannot.

91. Some research at Johns Hopkins University tends to show that organ transplant recipients benefit **less** from COVID vaccines.

---

[22] See Covid Spawns 'Completely New Category' of Organ Transplants. Covid Spawns 'Completely New Category' of Organ Transplants | Kaiser Health News (khn.org) (last accessed on March 20, 2023)

[23] *Id.* (quoting Dr. Tae Song, surgical director of the lung transplant program at the University of Chicago Medical Center.)

92. Johns Hopkins has published two studies in the March and May issues of JAMA in 2021, acknowledging that organ transplant recipients receive fewer benefits from COVID vaccines than others.[24]

93. According to the JAMA study in 2021, "[T]he number of transplant recipients in our second study whose antibody levels reached high enough levels to ward off a SARS-CoV-2 infection was still well below what's typically seen in people with healthy immune systems."[25]

94. In a recent article entitled, Doctors 'Push the Limit' with Organ Transplants as Covid-19 Extends Waitlists, Dr. Marwan Aboujioud, chair of Henry Ford Health System's Transplant Institute, was interviewed about how, in the face of COVID, "'[the] transplant community start[ed] pushing the limit.'" The article explained Dr. Aboujiod's meaning of the use of the phrase "push the limits"[26]:

> By 'pushing the limit,' he means using organs from donors who are labeled "increased risk" because of one of a number of factors, including they were old, obese, had diabetes, a history of drug use or were previously incarcerated, among other factors. Instead of simply ruling them out, Aboujioud said there's value in pairing those increased-risk donors with patients who have higher risk of dying on the wait list.

---

[24] See Organ Transplant Recipients Remain Vulnerable to COVID-19 Even After Second Vaccine Dose (hopkinsmedicine.org) (last visited March 20, 2023)

[25] *Id.*

[26] Doctors 'push the limit' with organ transplants as COVID-19 extends wait lists - mlive.com (updated September 29, 2021) (last visited March 20, 2023).

He used the example of a 70-year-old on dialysis with liver or kidney disease and a 25% chance of dying on the waiting list. If there's a 3-5% chance of an 'increased risk' organ not working, and a 1% chance of the patient developing treatable Hepatitis 8, is it worth the risk to try the transplant instead of waiting for a healthier donor to come along?

'At 70 years old on dialysis, your risk of dying is really high,' he said. 'Now if I give you kidney with increased risk, it might not last you 15 years but the statistics say you won't live 15 years ... When I say I can give you five years off dialysis, would you take it? I surely would.'

'It's an area the transplant community has battled with for some time. When I say increased risk, it's for us to manage the risk. We won't give you a bad organ but we'll match a donor with a recipient and redefine expectations.'

## COUNT I:

### FEDERAL CIVIL RIGHTS VIOLATION ON ACCOUNT OF RELIGION UNDER TITLE II OF THE CIVIL RIGHTS ACT OF 1964

95. Plaintiffs reallege and incorporate by reference each of the above allegations as though reproduced in each of the following paragraphs below.

96. Title II of the Civil Rights Act, codified at 42 U.S.C. § 2000a, provides in relevant part that "all persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a(a).

97. The Defendant is a government entity and a place of public accommodation that provides medical services as well as dining to the public.

98. The Hospital's pre-transplant vaccine requirements conflict with the Plaintiffs' religious beliefs and constitute a denial on the ground of the Plaintiffs' religion of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the hospital.

99. Plaintiffs are members of a protected class based on their religious beliefs.

100. Plaintiffs attempted to exercise their right to enjoy the full benefits of a place of public accommodation at the University of Michigan Transplant Center.

101. Plaintiffs were denied the equal benefits provided to non-religious adherents on the basis of their practice of religion.

102. After refusing COVID-19 vaccines on the basis of their sincerely held religious beliefs, Plaintiffs were removed from the transplant list because of their beliefs and the practice of their religion.

103. Removing Plaintiffs from Transplant List violates Title II by denying Plaintiffs the full and equal enjoyment of the accommodations at a place of public accommodation such as The University of Michigan Transplant Center on account of the practice of their religion.

**WHEREFORE**, the Plaintiffs **request relief as set forth in their Prayer for Relief.**

## COUNT II

### FIRST AMENDMENT, FREE EXERCISE CLAUSE

104.     The Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs above.

105.     The United States Constitution recognizes religious liberty and prohibits undue interference with the exercise of religion.

106.     The 1st Amendment to the United States Constitution states: "Congress shall make no law respecting the establishment of religion or prohibiting the free exercise thereof" which has been incorporated via the 14th Amendment to apply to the States.

107.     The Defendant violated Plaintiffs' free exercise of religion by imposing a COVID-19 Vaccination Mandate that does not contain a religious exemption for those with sincerely held religious beliefs.

108.     Plaintiffs have sincerely held religious beliefs which they communicated to the Defendant.

109.     Defendant violated Plaintiffs' inherent rights to religious freedom when it, without any explanation, transferred their status to "temporarily inactive."

110.     Defendant was acting under color of law by implementing regulations and of the federal government in imposing vaccine mandates on the population

when they removed the Plaintiffs from the Transplant List and when they imposed the UMHS vaccine mandate.

111. As a direct and proximate result of the Defendant's actions, Plaintiffs have suffered severe mental anguish and emotional distress, including but not limited to, stress and anxiety, and emotional pain and suffering.

112. A government mandate that infringes on the practice of religion is subject to a Strict Scrutiny test to determine if such mandate is enforceable, which Defendant cannot satisfy.

**WHEREFORE**, the Plaintiffs **request relief as set forth in their Prayer for Relief.**

## COUNT III:

### FOURTEENTH AMENDMENT DEPRIVATION OF LIFE WITHOUT DUE PROCESS OF LAW

113. The Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs above.

114. The Supreme Court of the United States has weighed in on a number of cases that fundamental rights such as the "fundamental right to an abortion

before viability" (c.f. *Cruzan*)[27] may not be infringed by placing a "substantial obstacle" in the path of exercising that right.

115.    Placing substantial obstacles on the right to obtain medical care "cannot be considered a permissible means of serving its legitimate ends."[28]

116.    Placing substantial obstacles on the right to obtain medical care "imposes an undue burden on the right to life."[29]

117.    Patients have a constitutional interest in their own right to life.

118.    The COVID-19 Vaccination mandate by the UNIVERSITY OF MICHIGAN BOARD OF REGENTS, and its removal of Plaintiffs from the Transplant List, imposes an undue burden on the Plaintiffs' right to life.

119.    Such removal from the Transplant List without hearing or any type of adjudication of the specific medical and spiritual needs of the plaintiffs constitutes a denial of Due Process.

120.    The Plaintiffs accrued certain rights by virtue of being approved to be placed on the Transplant List and such rights were taken away without providing Due Process of Law and Procedure.

---

[27] *Cruzan v. Director*, MDH, 497 U.S. 261 (1990)

[28] *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 136 S. Ct. 2292, 195 L. Ed. 2d 665, 2016 U.S. LEXIS 4063, 84 U.S.L.W. 4534, 100 Fed. R. Evid. Serv. (Callaghan) 887, 26 Fla. L. Weekly Fed. S 360

[29] Id.

121.    No Due Process or interactive process in any way was provided to the

Plaintiffs.

WHEREFORE, the Plaintiffs request relief as set forth in their Prayer for

Relief.

## COUNT IV

## FOURTEENTH AMENDMENT EQUAL PROTECTION CLAUSE

122.    The Plaintiffs re-allege and incorporate by reference herein all of the

allegations contained in paragraphs above.

123.    The Equal Protection Clause of the Fourteenth Amendment requires

that the government treat similarly situated persons alike.

124.    Some individuals on the Transplant List with medical exemption

requests were given exemptions and kept on the Transplant List while individuals

with religious objections, like the Plaintiffs, were denied and removed from the

Transplant List.

125.    Individuals on the Transplant List with medical objections to the

COVID-19 vaccines are similarly situated to those with religious objections.

126.    As such, Plaintiffs were treated less favorably than similarly situated

persons who do not hold religious views regarding the use of COVID-19

vaccinations.

WHEREFORE, the Plaintiffs request relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

Plaintiffs pray for declaratory and equitable relief as follows:

(a) Declare that Defendant's mandatory COVID-19 vaccination policy, and Defendant's removal of Plaintiffs from the Transplant List violated: (i) Title VII; (ii) the Free Exercise Clause of the First Amendment; (iii) the Due Process Clause of the 14th Amendment; and (iv) the Equal Protection Clause of the 14th Amendment;

(b) Require the Defendant to restore Plaintiffs' places on the active Transplant Waiting List in the position held when they were removed in 2021;

(c) Require Defendant to provide Plaintiffs with written notification from Defendant that their active status and position on the Transplant Waiting List have been restored;

(d) Enjoin the Defendant from taking any adverse action, or otherwise retaliate, against Plaintiffs based on their sincerely held religious beliefs or request for an exemption from receiving any of the COVID vaccines;

(e) Award Plaintiffs compensatory damages, monetary damages, punitive damages, nominal damages, attorneys' fees, costs of this suit, and such other relief the Court may deem appropriate.

Respectfully submitted,


PACIFIC JUSTICE INSTITUTE

By:    <u>s/ Dave Peters</u>
       David C. Peters II, JD, MS, PhD, Esq.
       Licensed in Michigan (P48648)
       Pacific Justice Institute
       Metro Detroit Office
       PO Box 51787
       Livonia, Michigan 48151-1787
       Email:  <u>dpeters@pji.org</u>
       Phone: (734) 732-4050/ (916) 857-6900
       Attorney for Plaintiffs

Exhibit 1

# STATE OF MICHIGAN

# COURT OF CLAIMS

ROSS BARRANCO and KATHLEEN SHIER,

      Plaintiffs,

v                                           Case No.  22-000091-MZ

UNIVERSITY OF MICHIGAN BOARD OF      Hon. Brock A. Swartzle
REGENTS,

      Defendant.

_____/

### ORDER GRANTING IN PART
### DEFENDANT'S MOTION FOR SUMMARY DISPOSITION

Plaintiffs sued defendant on claims that defendant's university hospital has infringed their religious liberties with respect to certain organ-transplant requirements.  Specifically, plaintiffs argue that defendant has violated their right to exercise their religious liberties by requiring that any organ-transplant recipient receive a Covid vaccination.  Plaintiffs bring two federal claims under the first and fourteenth amendments of our U.S. Constitution (Counts I and II, respectively) and two state claims under the free-exercise provision of art 1, § 4 of our Michigan Constitution of 1963 and the Elliott-Larsen civil rights act (Counts III and IV, respectively).

In lieu of an answer, defendant moved for summary disposition under MCR 2.116(C)(7) and (C)(8).  Plaintiffs responded, defendants replied, and this Court held a hearing on defendant's motion on December 1, 2022.  At the end of the hearing, this Court ordered supplemental briefing on defendant's motion, and the parties have submitted these briefs.

Prior to the hearing, the Court communicated to the parties that it perceived a serious problem with respect to subject-matter jurisdiction over plaintiffs' federal claims under MCL 600.6440, as applied by the Court of Appeals in *McKenzie v Dep't of Corrections*, 332 Mich App 289; 957 NW2d 341 (2020).  Under that provision, a party cannot sue the state (or department, etc.) in this Court of Claims if that party "has an adequate remedy upon his claim in the federal courts."  MCL 600.6440.  As the Court of Appeals explained in *McKenzie*, this provision means "that if a claimant has an adequate remedy for his or her claims in the federal court, the claimant *cannot* file the claim[s] in the Court of Claims."  *McKenzie*, 332 Mich App at 306.

-1-

During the hearing, the matter of this Court's jurisdiction over plaintiffs' federal claims was discussed.  Not surprisingly, defendant agreed with the Court's position; more importantly, plaintiffs offered no cognizable argument in favor of this Court having jurisdiction over the federal claims.  In fact, plaintiffs' counsel made clear that he intended to pursue the federal claims in federal court.  See Hr Tr pp 23-27.  Although defendant did not move for summary disposition under MCR 2.116(C)(4), this Court always has the authority to dismiss a claim for lack of subject-matter jurisdiction.  See *City of Southfield v Shefa, LLC*, __ Mich App __, __; __ NW2d __ (2022) ("A trial court is duty-bound to recognize the limits of its subject-matter jurisdiction, and it must dismiss an action when subject-matter jurisdiction is not present.").  Accordingly, for the reasons stated here and during the December 1, 2022 hearing, the Court will dismiss plaintiffs' Counts I and II for lack of subject-matter jurisdiction.

As to the state claims, defendant moved for summary disposition on plaintiffs' Elliot-Larsen claim under MCR 2.116(C)(8).  This argument is well-taken, as plaintiffs have not stated a viable claim for relief under the Elliot-Larsen act.  Whether a vaccine requirement is medically sound is a separate question, one not taken up here.  Rather, to state a claim under the Elliot-Larsen act, a party must allege facts that the party was discriminated against based on a protected characteristic.  MCL 37.2302.

On this score, plaintiffs have asserted no factual allegation that, with respect to vaccine status, defendant has subjected them to any requirement or treatment different than what it demands of other potential organ-transplant recipients.  Plaintiffs have made no specific allegation that defendant required them to be vaccinated *because* they hold certain religious views.  They make no coherent actionable claim of intentional discrimination or disparate treatment.

Instead, plaintiffs argue that their religious liberties have been infringed by defendant's vaccine requirement.  But, the Elliot-Larsen act protects against discrimination based on, among other things, religion; it does not protect the free exercise of religion.  In fact, as discussed during the Court's hearing, our Legislature has taken up, and rejected each time, proposed amendments to the Elliot-Larsen act that would add more robust religious-liberties protections to our civil-rights statutes.  (Other states and the federal government have enacted such protections in what are called "religious freedom restoration acts.")  It is not the place of this Court to act as a quasi-legislative body and find protections in statute that are simply not there; rather, this question is for our Legislature to decide, with input from the state's constituents.  *D'Agostini Land Co LLC v Dep't of Treasury*, 322 Mich App 545, 560; 912 NW2d 593 (2018).  Accordingly, for these reasons as well as those set forth during this Court's December 1, 2022, hearing at pages 33-37, the Court will grant summary disposition to defendant on plaintiffs' Elliot-Larsen claim under MCR 2.116(C)(8).

Finally, with respect to plaintiffs' remaining state-law claim—the claim that defendant violated plaintiffs' right to the free exercise of religion under Const 1963, art 1, § 4 (Count III)—defendant has not moved for summary disposition on that claim under MCR 2.116(C)(8).  Rather, defendant has moved for summary disposition on that claim under MCR 2.116(C)(7) on the basis that the claim is preempted under federal law.  This is a complex question that requires a deep understanding of the federal organ-transplant scheme, as enacted by Congress and adopted by hospitals across the country.  The Court asked for supplemental briefing on this matter, and, as

mentioned above, the parties have submitted their briefs. Because additional study and analysis are needed, the Court will take the question of preemption under advisement and rule on this aspect of defendant's motion in a separate opinion and order in the future.

Accordingly, the Court orders as follows:

IT IS ORDERED that, on the Court's own motion under MCR 2.116(C)(4) and (I)(1), Counts I and II of plaintiffs' complaint (the federal claims) are DISMISSED for lack of subject-matter jurisdiction.

IT IS FURTHER ORDERED that defendant's motion for summary disposition is GRANTED IN PART and Count IV of plaintiffs' complaint (the Elliot-Larsen claim) is DISMISSED for failure to state a claim for relief under MCR 2.116(C)(8).

IT IS SO ORDERED. This order does not resolve the final claim and does not close the case.

Date: <u>March 6, 2023</u>

Hon. Brock A. Swartzle
Judge, Court of Claims

-3-